**SO ORDERED,**

*Katharine M. Samson*

**Judge Katharine Samson**
**United States Bankruptcy Judge**
**Date Signed: January 8, 2014**

**The Order of the Court is set forth below. The docket reflects the date entered.**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| **IN RE:  DOUGLAS G. BROOME** | **CASE NO. 11-50528-KMS** |
| **DEBTOR** | **CHAPTER 7** |
| **WESTWOOD SQUARE LIMITED PARTNERSHIP**<br>**& ROBERT M. BUCHANAN, JR.** | **PLAINTIFFS** |
| **V.** | **ADV. NO. 11-05047-KMS** |
| **DOUGLAS G. BROOME** | **DEFENDANT** |

### <u>MEMORANDUM OPINION</u>

This matter came before the Court for trial[1] on the Complaint, (Adv. Dkt. No. 1),[2] to determine the dischargeability of certain debts filed by Robert Buchanan and Westwood Square Limited Partnership (collectively the "Plaintiffs") and the Answer and Defenses to Complaint, (Adv. Dkt. No. 7), filed by Douglas G. Broome ("Broome" "Defendant" or "Debtor"). At Trial, James Leo Quinn represented the Plaintiffs and John G. Holaday represented the Defendant. By

---

[1] A three-day bench trial was held June 17–18, 2013 and July 16, 2013 (the "Trial").

[2] Unless stated otherwise, citations to the record are as follows: (1) citations to docket entries in the adversary proceeding, Adv. Proc. No. 11-05047-KMS, are cited as "(Adv. Dkt. No. ___)"; and (2) citations to docket entries in the main bankruptcy case, Case No. 11-50528-KMS, are cited as "(Dkt. No. ___)".

stipulation, the parties introduced forty-five exhibits into evidence.[3] These exhibits and witness testimony were the only evidence presented at Trial. At the close of Plaintiff's case, Debtor made an ore tenus motion for judgment.[4] The Court took Debtor's motion under advisement but allowed Debtor to respond to Plaintiffs' case. The Court, having considered the evidence, finds that the obligation is non-dischargeable in part for the reasons set forth below.

## I. JURISDICTION

The Court has jurisdiction of the parties to and the subject matter of this Adversary pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(A), (B), (I), & (O). The parties entered a pre-trial order asserting jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157. (Adv. Dkt. No. 76 ¶ 4).

## II. FINDINGS OF FACT[5]

### 1. Bankruptcy and Adversary Cases

On March 5, 2011, Broome filed for relief under Chapter 7 of the Bankruptcy Code.[6] In his schedules, Broome listed "Westwood Square Ltd."[7] as an unsecured creditor with a claim in the amount of $58,100.00 based on a personal guaranty of business debt. (Dkt. No. 3, at 30). The claim is listed as disputed. (*Id.*). Westwood Square Limited Partnership ("Westwood Square") filed a proof of claim (Claim 15-1) and amended proof of claim in the amount of $395,000.00 for

---

[3] Plaintiffs' exhibits P-1 through P-23 were admitted into evidence. Exhibits P-24 and P-25 were marked for identification purposes but were not admitted into evidence.  Defendant's exhibits D-1, D-3 through D-16 and D-18 through D-23 were admitted into evidence. Defendant's exhibit D-17 was not admitted into evidence, and exhibit D-2 was purposely left blank.

[4] June 18, 2013 Tr. 181–89.

[5] In the Pre-Trial Order (Adv. Dkt. No. 76), the parties stipulated to certain facts, several of which are incorporated herein. Additional facts taken from the record or from testimony at trial have also been included.

[6] (Dkt. No. 1). "Bankruptcy Code" or "Code" refers to the United States Bankruptcy Code located at Title 11 of the United States Code. All Code sections hereinafter will refer to the Bankruptcy Code unless noted otherwise.

[7] The proper name of the company is "Westwood Square Limited Partnership."

money loaned. (Claim 15-2). The claim is listed as secured by a deed of trust of unknown value. (*Id.*). A promissory note in the amount of $360,000.00; a personal guaranty signed by Broome and others obligating themselves jointly and individually to the obligations of the note; and an assignment of a deed of trust held by Cornerstone Construction Company, LLC ("Cornerstone Construction") are all attached to the amended proof of claim.

According to his schedules, Broome is or was involved with several companies: Cornerstone Realty, LLC ("Cornerstone Realty")[8] a Century 21 real estate agency; Cornerstone Construction;[9] Cornerstone Home Loans, LLC;[10] and Pancho's Mexican Buffets of Mississippi, LLC.[11] (Dkt. No. 3, at 5).

On September 30, 2011, Plaintiffs filed a timely adversary complaint against Broome seeking to have a $360,000 debt declared non-dischargeable. (Adv. Dkt. No. 1). The debt arose out of a loan for the construction of Pancho's Mexican Buffet and Broome signed a promissory note and personal guarantee in favor of Westwood Square.[12] The Complaint asserts that Broome

---

[8] Broome (51%) and Matthew J. Pellerin ("Pellerin") (49%) are members of Cornerstone Realty. The company was in business from January 1999 to about 2010. According to Broome, summer of 2009 was the last time there was consistent real estate business for the company. Lindy Ray Tolar ("Tolar"), an employee of Cornerstone Realty, testified otherwise.

[9] Broome (51%) and Pellerin (49%) are members of Cornerstone Construction.

[10] According to Schedule B, Cornerstone Home Loans LLC ceased operations in June of 2003. (Dkt. No. 3, at 5).

[11] Broome, Pellerin and Tolar were the original members of Pancho's Mexican Buffets of Mississippi, LLC. Broome was the managing member holding a majority of the membership interest. At a later date, the original members conveyed a membership interest to Westwood Square.

[12] Plaintiffs maintain that either Robert M. Buchanan Jr. ("Buchanan"), Westwood Square, or both advanced around $400,000.00 for the financing of the build-out and operations of a Pancho's Mexican restaurant. But at Trial counsel for Plaintiffs represented that they seek only a determination that the original $360,000.00 loan is non-dischargeable. *See* (Adv. Dkt. No. 76 ¶ 3) ("debt to which challenge has been made to discharge was personally guaranteed by . . . Broome . . . in the amount of $360,000.").

Plaintiff Buchanan is the general partner of Plaintiff Westwood Square. Buchanan, in his individual capacity, is not a signatory to the $360,000.00 note and guaranty signed by Broome. Only a creditor has standing to assert a claim of non-dischargeability under § 523(a). *See* 11 U.S.C. § 523(c); *Fezler v. Davis (In re Davis)*, 194 F.3d 570, 574 (5th Cir. 1999) (action to except debt from discharge must be brought by creditor).

failed to disclose the fact that he signed an unrecorded cancellation of a deed of trust prior to assigning the deed of trust to Westwood Square as collateral for a loan. (Adv. Dkt. No. 1, at 2 ¶10). The complaint further asserts that Broome misrepresented to Plaintiffs the existence or availability of working capital and that he used proceeds of the loan for expenses other than for the build-out of the restaurant. (*Id.* at 4 ¶20). Broome filed an answer denying the material allegations contained in the Complaint. (Adv. Dkt. No. 7). Additionally, he asserted various affirmative defenses, including apportionment of damages under state law, which were not advocated at Trial and are therefore abandoned.

The Court held a Trial on the matter. At the close of the Plaintiffs' case, counsel for Broome moved for "directed verdict,"[13] which the Court will treat as a motion for judgment on partial findings under Rule 52(c) of the Federal Rules of Civil Procedure, applicable under Rule 7052 of the Federal Rules of Bankruptcy Procedure.[14] Pursuant to Rule 52(c), the Court reserved the right to hear all of the evidence before ruling and then took the matter under advisement. (June 18, 2013 Tr. 189). In deciding a motion for judgment on partial findings, "the Court is not

---

The only requirement for standing to bring a nondischargeability action based on § 523(a)(6) is that the action must be brought by a creditor. 11 U.S.C. § 523(c). A creditor is an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10)(A). A "claim" is defined as a "right to payment, whether or not such right is reduced to judgment . . . ." 11 U.S.C. § 101(5)(A).

*Id.* Any reference to a ruling herein as to Buchanan is in his capacity as the general partner of Westwood Square and not in his individual capacity. Absent documentation stating otherwise, Buchanan does not appear to be a creditor of Broome. Accordingly, he does not have standing to bring a § 523(a) action in his individual capacity.

[13] June 18, 2013 Tr. 181–89.

[14] "In a bench trial, the appropriate vehicle for dismissing a case as a matter of law at the close of plaintiff's evidence is a Rule 52(c) judgment on partial findings." *Weber v. Gainey's Concrete Prods., Inc.,* No. 97-31267, 1998 WL 699047, at *1 n.1 (5th Cir. Sept. 21, 1998) (unpubl.) (citation omitted). *See also* Holly v. Ziff (*In re* Ziff), Civ. A. No. 3-93-0034-R, 1993 WL 669427, at *2 (N.D. Tex. Oct. 28, 1993) (treating appellee's motion for directed verdict, which applies in jury trials, as motion for judgment on partial findings pursuant to Rule 52(c), which applies in nonjury trials); Soisson v. Hillebrandt (*In re* Hillebrandt), No. 10-00068-NPO, 2011 WL 2447738, at *8 (Bankr. S.D. Miss. June 15, 2011) (treating motion for summary judgment asserted by defendant at close of plaintiff's case-in-chief as motion for judgment on partial findings pursuant to Rule 52(c)).

required to draw any inferences in favor of the non-moving party, as would be required for a motion for judgment as a matter of law under Rule 50, but can make findings in accordance with its own view of the evidence." *Miles-Hickman v. David Powers Homes, Inc.*, 613 F. Supp. 2d 872, 880 (S.D. Tex. 2009) (citations omitted). Because the Court finds that Plaintiffs established the requisite elements of 11 U.S.C. § 523(a)(2)(A), Broome's motion is denied.

## B. Background

### 1. Purvis Porches Deed of Trust

After receiving an inheritance, Michael Robinson ("Robinson") approached Broome about investing the inheritance in real estate.[15] Broome sold Robinson a lease for 4.6 acres of 16th section land in Purvis, Mississippi for $96,000.00.[16] At Broome's suggestion, Robinson decided to construct townhomes on the land ("Purvis Porches project").[17] Robinson entered into a contract with Broome's company, Cornerstone Construction, to build the townhome development.[18] On January 14, 2008, in connection with the Purvis Porches project, Robinson executed a deed of trust note ("Note") and deed of trust ("Deed of Trust") in favor of Cornerstone Construction in the amount of $1,344,000.00. (June 17, 2013 Tr. 187–88; Exhs. P-4, P-5). The Deed of Trust was recorded in the land records of Lamar County, Mississippi, on May 16, 2008. (*Id.* at 188; Exh. P-5). No money changed hands upon execution of the Note and Deed

---

[15] (June 17, 2013 Tr. 184). Robinson and Broome were acquainted prior to the transaction: Robinson had worked for a radio station that sold advertisements to Broome for his real estate company. (*Id.*).

[16] (June 17, 2013 Tr. 185). Robinson paid $96,000.00 for the lease and $16,000.00 to renovate a house on the property. (*Id.* at 186).

[17] (*Id.* at. 185). Initially, Robinson was the sole owner of the property. (*Id.* at 186). But at some point, Robinson formed Purvis Porches, LLC and in 2009, he conveyed an ownership interest to Wesley Brewer. (*Id.* at 163–64).

[18] (*Id.* at 185). Cornerstone Realty had a contract with Robinson to market and manage the townhomes. (July 16, 2013 Tr. 16). The company also had several other contracts in place with Robinson and Purvis Porches, including a construction contract; a contract to either sell just he individual townhomes or to sell the individual townhomes and the entire project; and a rental or management contract, in the event Robinson retained his interest in the project. (*Id.* at 15–16).

of Trust. (June 17, 2013 Tr. 191). Under the terms of the Note, principal and interest would be paid: "$150,000.00 per quarter commencing on July 1, 2008, or $24,000.00 per unit sold, whichever payment event shall occur first." (Exh. P-4). No payments were made to Cornerstone Construction under the terms of the Note. (July 16, 2013 Tr. 36). According to Robinson, who undisputedly did not have the financial means to repay the Note, he was to pay Broome $1,344,000.00 upon construction of the townhomes, provided that financing could be obtained.[19] Broome initially worked with Robinson to obtain financing but they never procured any additional funding.[20]

On December 9, 2008, Broome signed a cancellation and release of the Deed of Trust on behalf of Cornerstone Construction in connection with an application to obtain financing for the Purvis Porches project (the "Cancellation"). (Exh. P-7; Stipulated Fact, Adv. Dkt. 76 ¶ 5(f)). According to Broome, he signed the Cancellation in connection with a closing with BancorpSouth Bank to obtain funds for Construction of the first eight townhomes, but the closing never occurred. (July 16, 2013 Tr. 21–22). Broome maintains that the Cancellation was to be held in trust for the BancorpSouth closing and would be destroyed if the closing did not occur. (*Id.* at 21). William L. McDonough, Jr., Esq. ("McDonough"), who represented Broome and Cornerstone Construction in the Purvis Porches project, corroborated Broome's testimony

---

[19] (June 17, 2013 Tr. 189). Robinson testified that the Note and Deed of Trust were supposed to be valid only if financing became available and the townhome development was completed. (*Id.* at 201). Robinson asserts that he left financing up to Broome. (*Id.* at 186). But neither the Note nor the Deed of Trust contains such a contingency provision. (*Id.* at 202; *see* Exhs. P-4, P-5).

[20] (June 17, 2013 Tr. 190). Broome testified that at the time the Note and Deed of Trust were drafted, it was understood that Robinson did not have the ability to pay the $1,344,000.00 amount owed. (*Id.* at 78). Broome represented that the $1,344,000.00 was the amount Cornerstone Construction was to receive under the construction contract. (*Id.* at 75–76). He also explained that if Robinson defaulted on the Note, Cornerstone Construction could take the property and continue developing it if the company could obtain financing. (*Id*. at 79–80).

According to Broome, Cornerstone Construction obtained financing for the initial infrastructure of the project but the company providing the financing stopped doing business in Mississippi, leaving the project unfunded. (*Id.* at 14). After several attempts, Cornerstone Construction was unable to obtain financing. (*Id.* at 19).

that the Cancellation was valid only for a specific closing that, to his knowledge, never took place.[21]

Apparently, the Cancellation has been located in the files of F. Douglas Montague, III, Esq. ("Montague")—the beneficiary and trustee under the Deed of Trust. The Cancellation was not recorded in the land records,[22] but the Deed of Trust's validity is currently the subject of litigation in the Chancery Court of Lamar County, Mississippi.[23]

### 2. Pancho's Mexican Restaurant

Broome is the managing member of Pancho's Mexican Buffets of Mississippi, LLC ("Pancho's"), which obtained a franchise to open a Pancho's Mexican Restaurant. (July 16, 2013 Tr. 22). In late June or July of 2009, Broome approached Buchanan—an experienced businessman—about leasing space in a shopping center owned by Buchanan's company, Westwood Square. (*Id.*). He also sought financing for the build-out of the restaurant, which would be handled by Cornerstone Construction. (*See Id.* at 31–32). Before entering into an agreement, Buchanan conferred with Pancho's members Broome, Pellerin, and Tolar via phone

---

[21] (June 18, 2013 Tr. 193). According to McDonough, he received an email on December 9, 2008 from F. Douglas Montague, III, Esq. ("Montague") instructing him to hold certain documents in trust pending the close of financing and execution of an addendum to a unit construction contract and release of the infrastructure contract. (*Id.* at 212–13; Exh. P-8). A second note and deed of trust executed by Robinson in favor of Cornerstone Construction in the amount of $250,000.00 were among the documents held in trust. (*Id.* at 213; Exh. P-10). Though he could not identify the lender, McDonough testified that the closing never occurred. (*Id.* at 202). He represented that there was no understanding as to what would be done with the cancellation if the closing did not occur. (*Id.* at 196). In October 2009, McDonough sent a letter to Broome summarizing a conversation they had regarding authority to allow a cancellation of the Deed of Trust only in connection with a closing with Regions Bank for financing. (*Id.* at 203). He also sent a letter to Montague summarizing the same conversation with Broome and authorizing Montague to record a cancellation of the Deed of Trust "only upon and at the time of the closing of the construction loan from Regions Bank on the Purvis Porches property." (*Id.* at 204). McDonough stated that the closing date was extended a number of times but, due to certain problems, closing never occurred. (*Id.* at 219–20).

[22] At Trial, Counsel for both parties stipulated that, to their knowledge, the Deed of Trust assigned by Cornerstone Construction to Westwood Square has not been cancelled. (June 18, 2013 Tr. 163).

[23] (Exh. P-22). According to the Complaint for Declaratory Judgment Montague filed in Chancery Court on April 12, 2011, Purvis Porches claims that there is no unpaid balance on the Deed of Trust and that it should be cancelled. (Exh. P-22 at 3). But Westwood Square maintains that there is an outstanding balance due and owing on the Deed of Trust. (*Id.*).

and in person on several occasions.[24] During that time, Broome provided Buchanan with a prospectus on the Pancho's franchise, including a budget for the construction of the restaurant and projected monthly operating expenses for the restaurant. (Adv. Dkt. No. 76 ¶ 5(k)). Broome asserts that he also provided Buchanan with the Conversion and Start-Up Budget ("Budget")[25] during the negotiations.[26] According to the Budget, Pancho's would provide an initial investment of $90,136.00 for the franchise and pre-opening expenses; the lessor's loan would partially fund construction costs budgeted at $373,153.17; and an "SEMCIC loan" would cover the $80,943.32 training and grand opening budget and provide $50,000.00 in working capital. (Exhs. P-20; D-1).

Buchanan was considering making the construction loan and taking the restaurant equipment as collateral. (June 18, 2013 Tr. 72). He specifically testified that there were no discussions about use of loan proceeds for owner draws or non-build-out expenses. (Id. at 75–76). In August of 2009, Buchanan expressed his desire for additional security for the loan. (July 16, 2013 Tr. 32). In response, Broome offered Buchanan an assignment of the Purvis Porches Deed of Trust.[27] Broome explained that Cornerstone Construction held a Deed of Trust on the Purvis Porches project as security for the construction that had not yet begun. (July 16, 2013 Tr.

---

[24](See Id. at 24). According to Pellerin and Tolar, Broome was in charge of the entire Pancho's project and Pellerin handled the construction. (June 17, 2013 Tr. 219). Tolar testified that the he and Pellerin were sheltered from Buchanan. (Id. at 128).

[25] (See July 16, 2013 Tr. 27–28). The Budget, prepared by the Pancho's members, totals $594,232.49 for the complete conversion and start-up of the restaurant. (Exhs. P-20; D-1).

[26] Buchanan's testimony was unclear as to whether he actually received the Budget prior to agreeing to extend the loan. (See July 18, 2013 Tr. 130–33). In any event, Buchanan testified that he received a document similar to the Budget. (Id. at 132).

[27] (Id. at 33). Broome asserts that the intent in August was for the Deed of Trust to serve as collateral until the restaurant equipment was delivered; thereafter, the assignment would be released and the security for the entire agreement would be the renovated space and equipment. (Id. at 34–35). But none of the instruments memorializing the agreements between the parties reflect this subjective intent. See (Exhs. P-1; P-2; P-6; D-15). And the parol evidence rule prevents the Court from considering evidence of such an agreement outside the four corners of the written agreements. See In re Riedel, No. 10-51106-KMS, 2011 WL 5025324, at *4 (Bankr. S.D. Miss. Oct. 21, 2011) (discussing parol evidence rule; when contract has been reduced to writing, no evidence may be given of terms of such contract except writing itself; prior contemporaneous negotiations are merged into completed contract).

33). Broome did not disclose to Buchanan that he had signed a Cancellation of the same Deed of Trust about nine months earlier. (*Id.* at 36). Broome testified that he did not think about mentioning the Cancellation because he thought the Cancellation was "null and void," since it was signed only in connection with a closing that never occurred.[28]

According to Buchanan, he believed that the Purvis Porches project "was kind of a bird's nest on the ground[,] that everything was done, it was just waiting to bloom out." (June 18, 2013 Tr. 69). While he claims that he was led to believe the units were pre-selling "like hotcakes," (*Id.*), Buchanan acknowledged that construction had not commenced. (*Id.* at 71). Without conducting any title search or due diligence regarding the Deed of Trust, and without viewing the Purvis Porches property, Buchanan agreed to accept an assignment of the Deed of Trust as additional collateral. (*Id.* at 145–46).

On September 8, 2009, Pancho's entered into a Commercial Lease, (Exh. P-3), and an Agreement for Commercial Lease and for Financing of Build-Out ("Agreement"), (Exh. P-1), with Westwood Square. Broome, Pellerin, and Tolar each personally guaranteed the Commercial Lease and the Agreement. (Exhs. P-1, at 5; P-3, at 7).[29] On October 2, 2009, pursuant to the terms of the Agreement, Pancho's, through its members, executed a promissory note in favor of Westwood Square in the amount of $360,000.00, and a separate security agreement granting Westwood Square a security interest in equipment and property purchased or acquired for the

---

[28] (July 16, 2013 Tr. 36). McDonough testified that on October 26, 2008, about three weeks after Cornerstone Construction assigned the Deed of Trust to Westwood Square, Broome contacted him regarding another closing and possible recording of the Cancellation. (June 18, 2013 Tr. 193). Broome did not tell McDonough about the assignment of the Deed of Trust. (*Id.* at 205).

[29] Pursuant to the Agreement, Westwood Square agreed to provide Pancho's with financing in an amount not exceeding $360,000.00 "for purchase of restaurant equipment and for 'build-out' for construction of additions and improvements" in exchange for a first lien on all equipment purchased by Pancho's and for additional collateral consisting of a "[s]ecurity interest in a Promissory Note and Deed of Trust securing construction project in Purvis, Mississippi by Cornerstone Construction Co., LLC . . . ." ( Exh. P-1 ¶¶ 1, 6). The Agreement defines "build-out" as "certain additions and modifications" to the commercial space. (*Id.* at ¶1).

restaurant. (Exhs. P-2; D-15). Pancho's members each personally guaranteed the note. (Exh. P-2, at 7). Pursuant to the terms of the Agreement, Cornerstone Construction also executed an "Assignment of Deed of Trust and Promissory Note and Security Agreement" through its members, which assigned its Note and Deed of Trust in the amount of $1,344,000.00 to Westwood Square as security for the $360,000.00 note "together with any other indebtedness that may become due and owing by Poncho's [sic] to Westwood."[30]

On September 8, 2009—the day the Agreement was signed—Westwood Square made $190,000.00 available for use by Pancho's. (Exh. P-13). Starting September 10, 2009, Pancho's members began using those funds to pay expenses not itemized as construction expenses according to the Budget, including owner draws for themselves. (*See* Exhs. P-14; P-15; P-16). The remaining loan proceeds were deposited into Pancho's bank account in equal installments of $85,000.00 on October 12, 2009 and November 17, 2009. (Exh. P-13). By early December of 2009, Pancho's had spent the entire $360,000.00 loaned by Westwood Square and needed additional funds to complete the build-out and open the restaurant. (*See* Exh. P-16, at 7).

According to Pellerin, who held the contractor's license for Cornerstone Construction,[31] the build-out project experienced a number of "unanticipated" set-backs early in construction. (June 18, 2013 Tr. 21). Specifically, the City of Hattiesburg required an upgraded plumbing system and rewiring of the electrical system, (*Id.* at 21–22); an engineer had to design a new grease trap; the HVAC system was not large enough for the total square footage of the

---

[30] (Exh. P-6, at 2). For the most part, the parties focused on the assignment of the Deed of Trust and the purported Cancellation at trial. In fact, the parties stipulated that the Deed of Trust was assigned from Cornerstone Construction to Westwood Square. (Adv. Dkt. No. 76 ¶ 5(g)). The Court notes that the same instrument assigning the Deed of Trust also assigned the Note. (Exh. P-6).

[31] Although Pellerin only holds a residential contractor's license, he maintained that the license authorizes him to construct light commercial projects up to 7,500 square feet and that he believes that the restaurant build-out qualified as such a project, even though the space was 10,000 square feet. (June 17, 2013 Tr. 213–14, 216).

restaurant; and the fire marshal required additional sprinklers and a fire alarm. (*Id.* at 22). Broome testified that the electrical and HVAC issues resulted in a $70,000.00 cost overrun and the grease trap issue resulted in a $10,000.00 cost overrun.[32]

Westwood Square agreed to provide $35,000.00 in additional financing in exchange for a membership interest in Pancho's so that the restaurant could open and commence operations. (Exh. P-18). On December 17, 2009, pursuant to this new agreement, Pancho's executed a promissory note in favor of Westwood Square in the principal amount of $35,000.00, which was personally guaranteed by each of the Pancho's members.[33] Under the terms of the agreement, Pancho's members capped their salaries or other payments to themselves at $5,000.00 per month for Broome, $5,000.00 per month for Pellerin, and $2,500.00 per month for Tolar until such time as Pancho's became current on its obligations to Westwood Square. (Exh. P-18, at 2 ¶5). Pursuant to this agreement, Pancho's members also conveyed a 30% membership interest in Pancho's to Westwood Square. (*Id.* at 3; Exh. D-20; Adv. Dkt. 76 ¶ 5(j)).

Ultimately, the restaurant opened on January 31, 2010, over a month behind schedule and over budget. *See* (Exh. P-21). During early 2010, Westwood Square infused additional funds into the restaurant.[34] But Pancho's closed in early June 2010, never having earned a profit. (June 17, 2013 Tr. 73). Buchanan has not received any repayment of the $360,000.00 loan.

---

[32] (July 16, 2013 Tr. 45, 55). Broome and Pellerin seem to imply that these issues were somehow Buchanan's fault. But the Pancho's members inspected the space prior to entering into the lease. (June 18, 2013 Tr. 47). Moreover, Cornerstone Construction provided a budget for the build-out and, as contractor, knew or should have known about these potential issues. Pellerin testified that he had never renovated a restaurant space and that he did not disclose this fact to Buchanan. (June 17, 2013 Tr. 229).

[33] (Exh. P-17, at 5, 6). In addition, Pellerin and his wife executed a second deed of trust on their residence as collateral for the note. (Exh. P-18).

[34] (Exh. P-19). According to the General Ledger, it does not appear that Pellerin, Broome, or Tolar provided any capital contributions. (Exh. P-16).

### III. CONCLUSIONS OF LAW

**A. Burden of Proof**

A debtor is generally granted a discharge of all prepetition debts in a chapter 7 bankruptcy case, with the exception of certain debts described in § 523(a). *Bandi v. Becnel (In re Bandi)*, 683 F.3d 671, 674 (5th Cir. 2012) *cert. denied,* 133 S. Ct. 845 (2013). The Court of Appeals for the Fifth Circuit has stated that "[e]xceptions to discharge should be construed in favor of debtors in accordance with the principle that provisions dealing with this subject are remedial in nature and are designed to give a fresh start to debtors unhampered by pre-existing financial burdens." *In re Davis*, 194 F.3d at 573. In a proceeding under § 523, the party seeking a determination of non-dischargeability bears the burden of proof by a preponderance of the evidence.[35] Requiring the party objecting to the dischargeability of a debt to "carry the burden of proof comports with the policy behind federal bankruptcy law which favors discharge in an effort to provide the debtor with a fresh start." *Rustin v. Rustin (In re Rustin)*, No. 04-50890-NPO, 2011 WL 5443067, at *7 (Bankr. S.D. Miss. Nov. 9, 2011) (*citing* 4 Collier on Bankruptcy ¶ 523.05 (16th ed. 2010)). Plaintiffs seek to have the $360,000.00 debt guaranteed by Broome declared non-dischargeable under §§ 523(a)(2)(A) and (a)(2)(B).[36] Therefore, Plaintiffs bear the burden of proving each of the required elements of § 523(a)(2)(A), § 523(a)(2)(B), or both by a preponderance of the evidence.

---

[35] Grogan v. Garner, 498 U.S. 279, 287–88 (1991); Fed R. Bankr. P. 4005. "A fact is proven by a preponderance of the evidence if the Court finds it more likely than not the fact is true." *Lanier v. Futch (In re Futch)*, No. 09-00144-NPO, 2011 WL 576071, at *16 (Bankr. S.D. Miss. Feb. 4, 2011) (*citing EPA v. Sequa Corp. (In re Bell Petroleum Servs., Inc.)*, 3 F.3d 889, 909–10 (5th Cir. 1993)).

[36] They do not seek a determination that any subsequent loans or capital contributions to Pancho's, made during the time Westwood Square was a part owner, are non-dischargeable. *See* (Pre-Trial Order, Adv. Dkt. No. 76 ¶ 3).

**B. 11 U.S.C. § 523(a)(2)(B)**

Under § 523(a)(2)(B),[37] debts obtained by "a materially false and intentionally deceptive written statement of financial condition upon which the creditor reasonably relied are excepted from discharge." *In re Bandi*, 683 F.3d at 674–75. This exception to discharge only applies to statements respecting either the debtor's or an insider's financial condition. 11 U.S.C. § 523(a)(2)(B); *In re Bandi*, 683 F.3d at 674. Recently, the Fifth Circuit instructed that the term "financial condition," as used in § 523(a)(2), must be narrowly interpreted. *See In re Bandi*, 683 F.3d at 676 (false representation that debtors owned property was not statement respecting their "financial condition" thus § 523(a)(2)(A) and not § 523(a)(2)(B) applicable). The Court of Appeals explained that "the term was meant to embody terms commonly understood in commercial usage"—"the general overall financial condition of an entity or individual, that is, the overall value of property and income as compared to debt and liabilities." *Id.*

Buchanan failed to direct the Court to any statement in writing regarding either Broome's personal financial condition or his companies' overall financial condition.[38] The Complaint asserts that Broome "made statements including those in writing in the form of the "'Agreement for Commercial Lease and for Financing of Build-Out', Deed of Trust and the Assignment

---

[37] Section 523(a)(2)(B) provides:

> (a) A discharge under section 727. . . of this title does not discharge an individual debtor from any debt--
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
> > > (B) use of a statement in writing--
> > > > (i) that is materially false;
> > > > (ii) respecting the debtor's or an insider's financial condition;
> > > > (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> > > > (iv) that the debtor caused to be made or published with intent to deceive

11 U.S.C. § 523(a)(2)(B).

[38] If the debtor is an individual, a corporation of which he is a director, officer, or person in control is included in the definition of an "insider" under the Code. *See* 11 U.S.C. § 101(31).

thereof to the plaintiffs that were materially false and pertained to the debtor's financial condition." (Adv. Dkt. No. 1, at 5 ¶ 26). But the Agreement does not contain any statements regarding either Broome's overall financial condition or the overall value of Broome's property and income compared to his debts and liabilities; nor does it contain any such information related to Broome's companies.[39] And Buchanan did not identify any other "writings" he relied on in extending the loan that contain false statements regarding either Broome or his companies' financial condition.[40] At Trial, Buchanan testified that Broome presented himself as a savvy businessman with working capital.[41] Even assuming that such a representation constitutes a statement regarding debtor's financial condition, an oral representation is not actionable under § 523(a)(2)(B).[42] Accordingly, Plaintiffs have failed to carry their burden under § 523(a)(2)(B) and must therefore rely on § 523(a)(2)(A) for relief.

## C. 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge "any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). "Section 523(a)(2)(A) encompasses three similar grounds for non-dischargeability, all of which apply to 'debts obtained by frauds involving moral turpitude or intentional wrong.'" *In re Futch*, 2011 WL 576071, at *17 (*citing First National Bank LaGrange v. Martin (In re Martin)*, 963 F.2d 809, 813 (5th Cir. 1992)). The Fifth Circuit

---

[39] A promise to use funds in a certain manner is not a statement regarding a debtor's or insider's financial condition.

[40] The Court notes that Buchanan testified that he reviewed certain tax returns and other documents before extending the loan, however, he did not allege that any such documents contained any misrepresentations. And he also acknowledged that there was no loan application involved in the transaction.

[41] June 18, 2013 Tr. 75.

[42] The plain language of § 523(a)(2)(B) requires "use of a statement *in writing*." 11 U.S.C. § 523(a)(2)(B) (emphasis added).

has recognized a distinction between the elements of proof required for false pretenses or false representation and those required for actual fraud. *AT&T Universal Card Services. v. Mercer (In re Mercer)*, 246 F.3d 391, 403 (5th Cir. 2001). This distinction "appears to be a chronological one, resting upon whether a debtor's representation is made with reference to a future event, as opposed to a representation regarding a past or existing fact." *ETRG Investments, LLC v. Hardee (In re Hardee)*, No. 11-60242, 2013 WL 1084494, at *12 (Bankr. E.D. Tex. Mar. 14, 2013) (*citing Bank of Louisiana v. Bercier (In re Bercier),* 934 F.2d 689, 692 (5th Cir.1991) ("[A debtor's] promise ... related to [a] future action [that does] not purport to depict current or past fact . . . therefore cannot be defined as a false representation or a false pretense.")). In contrast, a party objecting to discharge of a debt under § 523(a)(2)(A) for *actual fraud* must demonstrate that: (1) the debtor made representations; (2) the debtor knew the representations were false at the time they were made; (3) the representations were made with the intention and purpose to deceive the creditor; (4) the creditor actually and justifiably relied on the representations; and (5) the creditor sustained a loss as a proximate result of its reliance. *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995).

### 1. Cancellation of the Deed of Trust

It is undisputed that Buchanan, on behalf of Westwood Square, was not willing to make a loan to Pancho's without additional security. Broome, the managing member of Pancho's, offered an assignment of the Deed of Trust but failed to disclose the existence of the Cancellation. Westwood Square asserts that Broome's failure to disclose the Cancellation equates to fraud and, as a result, the underlying debt is non-dischargeable. But the evidence before the Court established that the Cancellation was only authorized for a specific purpose—a closing—that did not occur. And McDonough—a credible, independent third-party attorney—

substantiated Broome's testimony that no closings occurred that would have authorized the recording of the Cancellation. Further, no evidence was adduced at Trial showing that Broome had any belief that the Cancellation was valid or that the Deed of Trust was invalid[43] at the time he offered and assigned it to Westwood Square. *See General Electric Capital Corporation. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005) (honest belief, even if unreasonable, that representation is true and speaker had information to justify it does not amount to intent to deceive). Therefore, Westwood Square cannot prove the requirements of § 523(a)(2)(A) as they relate to Broome's failure to disclose the Cancellation.

At Trial, counsel for Buchanan attempted to elicit testimony regarding the progress of the Purvis Porches project and Robinson's ability to pay the Note. But, while Buchanan testified that he relied on the Deed of Trust, he never stated that Broome misrepresented the origins of the Note and Deed of Trust or the value of the underlying property.[44] And Buchanan is an experienced businessman who is presumably informed about construction loans. In fact, he made a construction loan to Pancho's providing for release of the loan proceeds in installments as the project was completed. Buchanan knew that the Deed of Trust secured a contract for the development of townhomes and that construction had not yet started.[45] Therefore, it is more

---

[43] The Court does not make any determination regarding the validity of the Deed of Trust, as it is currently the subject of litigation in Chancery Court. At Trial, counsel for the parties stipulated that the Deed of Trust has not been cancelled to their knowledge.

[44] Regarding the $1,344,000 figure, Buchanan testified that he "assumed that [Broome] had an appraisal or some figures about the sales of what it would represent but [he] never questioned where it came from." But no evidence was presented indicating that Broome did not think the property would be worth $1,344,000.00 when the project was completed. Further, Buchanan acknowledged that Broome never represented that the property was worth $1,344,000.00 at the time of the assignment.

[45] At Trial, Counsel for Buchanan attempted to elicit testimony that would support his theory that Broome misrepresented the progress of the Purvis Porches project. (Tr. June 18, 2013 at 71). But the representations elicited at trial appear to be nothing more than mere puffery. And according to Pellerin, four townhouses had been presold and the contracts of the same were presented to Buchanan. (*Id.* at 49). There was no evidence or assertion that the townhomes were not in-fact presold. Further, aside from his counsel's arguments, Buchanan did not testify that he was misled or that he relied on any statements regarding the progress of the project.

likely than not Buchanan knew that the Deed of Trust would not be worth the face value of $1,344,000.00 until the project was complete.[46] Accordingly, to the extent Buchanan may have thought he held a security interest in property valued at $1,344,000.00, any such reliance would not be justified.

### 2. Use of Funds

The Complaint asserts that Broome falsely represented to Plaintiffs that 1) he had sufficient working capital for opening and operating the restaurant; and that 2) the loan proceeds would be used only to purchase equipment and for the build-out of the restaurant. (Adv. Dkt. No. 1, at 3 ¶¶ 14, 16). The Complaint further asserts that Broome knew these representations were false at all material times and that Plaintiffs justifiably relied on them. (*Id.* at ¶¶ 20-22).

### a. Broome falsely represented that he had sufficient working capital to open and operate Pancho's

The language of the Agreement governed the disbursements of loan proceeds and specifically provided that "prior to tender of any loan proceeds, Lessee will provide proof of application to the Area Development Partnership through Citizens Bank and construction work by Cornerstone Construction Co, LLC, owned by Lessee, showing sufficient available and ongoing working capital for commencement and continued operation of the restaurant." (Exh. P-1 ¶ 2). Therefore, by its own contract Westwood Square imposed an obligation upon itself to obtain satisfaction of sufficient working capital prior to tendering any funds. There is no evidence that Plaintiffs ignored this provision or that there were any false or misleading statements provided to them pursuant to this provision. Accordingly, Plaintiffs failed to prove justifiable or actual reliance relating to representations about working capital and the Court now turns to Plaintiffs' allegation regarding improper use of the loan proceeds.

---

[46] Buchanan acknowledged that Cornerstone Construction would be paid on the note as the townhomes were sold. (Id. at 139–40). And Both the Note and Deed of Trust were assigned to Westwood Square. (*Id.* at 140).

### b. Broome falsely represented that the loan proceeds would be used for the purchase of equipment and for build-out of the restaurant space.[47]

Broome does not deny that the primary purpose of the loan was to purchase equipment for Pancho's and renovate the leased space. But he does deny that these were the *only* purposes of the loan. Though there was conflicting testimony[48] regarding whether Buchanan knew or approved of expenses unrelated to the build-out, the documents submitted into evidence support Buchanan's testimony that the loan was extended solely for the purchase of equipment and renovation expenses. *See KMK Factoring, LLC v. McKnew (In re McKnew)*, 270 B.R. 593, 619 (Bankr. E.D. Va. 2001) (if funds are entrusted to debtor for specific purpose, debtor is regarded as impliedly representing his intention to use funds accordingly). On direct examination, Pellerin testified that he was unaware of any documents other than the Agreement, (Tr. Exh. P-1), and the Commercial Lease, (Exh. P-3), that governed the use of the loan proceeds. (June 18, 2013 Tr.

---

[47] At Trial, Broome objected to any evidence regarding any misrepresentations that were not specifically contained in the Complaint or Pre-Trial order. (June 18, 2013 Tr. 69). Broome maintained that the Complaint alleges only two misrepresentations: (1) Broome's failure to disclose the cancellation document he signed; and (2) the alleged misappropriation or misuse of the build-out funds. (*Id.*). Broome maintains that any alleged misrepresentation about the status or progress of the Purvis Porches project or Cornerstone Construction's ability as a contractor to build-out the restaurant is outside the scope of the Complaint. (*Id.*). Plaintiffs argued that any objection was waived by virtue of testimony elicited during the first day of Trial. (*Id.* at 70).

Even if the Complaint were conformed, no evidence was adduced at trial indicating that Broome, Pellerin, or Tolar made any false statements regarding the progress of Purvis Porches. Buchanan stated that he knew that construction had not started. (*Id.* at 150). Further testimony showed that four townhomes had been pre-sold. (*Id.* at 49). Moreover, no testimony was elicited indicating either that Buchanan asked about Cornerstone Construction or that Broome made any representations regarding the construction company. No evidence was presented showing that the construction company was incapable of performing the restaurant build-out. In fact, the build-out was completed and the restaurant opened only two of months behind schedule. Finally, Buchanan never stated that had he known that the construction company did not have experience in light commercial construction he would not have loaned the money to Pancho's.

[48] Buchanan challenges payments unrelated to the build-out of the restaurant, including payments of Cornerstone Realty rent and owner draws made to Pancho's members, among others. (Adv. Dkt. No. 1, at 3 ¶¶12–13; June 18, 2013 Tr. 75–76, 96). Broome did not testify that he specifically told Buchanan that he was using loan money to pay the expenses of the various Cornerstone companies, draws to members, and training expenses for Pancho's employees. Instead, Broome asserts that Buchanan should have known. In fact, he, Pellerin, and Tolar were paying themselves because, in the pre-loan meetings, they told him that to get Pancho's up and running they would have to divert their services from their real estate company to Pancho's. (July 16, 2013 Tr. 29–30). Conversely, Buchanan testified that he never had any discussions with Broome or any other members of Pancho's regarding the payment of expenses not related to build-out and equipment from the loan proceeds. (June 18, 2013 Tr. 75–76, 135).

15). Although the language of the Agreement specifically identifies a "Uses of Funds" that was submitted to Westwood Square, no document bearing that name was produced by any party.

Pursuant to the Agreement,

*Lessor accepts 'Uses of Funds' submitted to Lessor* and to Citizens Bank and Area Development Partnership as acceptable use of loan proceeds and agrees to funding of build-out as follows:

A. $105,000 to 'PMB Ent. West' at signature and inception for equipment purchase.

B. $85,000 (1/3 of Balance of Loan) at inception for immediate start of planning and construction process, and equipment move from Phoenix, AZ.

C. $85,000 (1/3 of Balance of Loan) upon completion of 1/3 of expenses and 'work' from 'Use of Funds' and certification by Lessee of build-out work completion.

D. $85,000 (1/3 of Balance of Loan) upon completion of 2/3 of expenses and 'work' from 'Use of Funds' and certification by Lessee of build-out work completion.

(Exh. P-1 ¶ 7) (emphasis added); *see Id.* at ¶ 4 (" . . . 'Use of Funds' document submitted to Lessor for this loan . . . ."). Broome asserts that the Budget allegedly provided to Westwood is evidence of the permissible and approved use of funds. (Exh. P-20).

Regardless of whether the Budget is the "Uses of Funds" referenced in the Agreement, all of the documents in evidence convey the same theme—that the financing was solely for the purchase of equipment and build-out of the restaurant. (Exh. P-1) ("lessor will provide funding . . . for purchase of restaurant equipment and "build-out" for construction of additions and improvements. . . ."); (Exh. P-20) (*compare* "Franchise and Pre-opening Budget" funded by Pancho's *and* "Training and Grand Opening Budget" and "Working Capital" requested through SEMCIC loan *with* "Conversion & Changeover Start-up Budget" of $373,153.17 funded through Lessor loan). The Agreement itself defines build-out as "certain construction additions and

modifications." (Exh. P-1, at 1). None of the documents support any inference that payment of owner draws, Cornerstone Realty rent and related expenses, salaries for Cornerstone Realty employees, manager training and travel, advertisements, cellular phone bills, and meals were authorized expenses. To the contrary, the Budget specifically provides that proceeds of the $360,000.00 loan would be spent on equipment and certain build-out related items, not any initial start-up, training, or grand opening expenses. (Exh. D-12, at Broome-Panchos-0481–82). Further, there were never any discussions regarding use of the proceeds for any other purposes. Thus, the evidence in this case establishes that a portion of the loan proceeds were used in a way not contemplated by the Agreement or the Budget. Thus, the first element of actual fraud—that Broome made a false representation—has been met.

### c.   Broome knew at the time that he signed the loan documents that the loan proceeds would be used for purposes other than the intended purpose.

As noted above, Broome never addressed the use of the loan proceeds for personal and other purposes not specified in the Agreement. But the day after the loan proceeds were deposited into Pancho's account, payments were made to the Pancho's members—including Broome—and in the following days various payments were made for items unrelated to construction or equipment. (Exhs. P-14; P-15; P-16). The fact that Broome immediately used the loan proceeds to pay expenses not contemplated by the Agreement leaves no doubt that Broome knew that the representations to Westwood were false when they were made. Thus, the second element of actual fraud has been met.

### d.   Broome intended to deceive Plaintiffs.

Absent direct evidence of fraudulent intent, which rarely exists, courts look to surrounding circumstances to determine intent.

[I]ntent to deceive may be inferred from "reckless disregard for the truth or falsity

of a statement combined with the sheer magnitude of the resultant misrepresentation." Nevertheless, an honest belief, even if unreasonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive.

*Acosta*, 406 F.3d at 372 (citations omitted). The most striking evidence of intent in this case is the speed with which Broome and his partners depleted the loan proceeds for expenses not related to the purpose of the loan. Within 35 days of the first installment, more than $55,000.00 of the loan proceeds was spent on items not contemplated by the loan documents. (*See* Exh. P-16, at 1–3). In an attempt to defeat the intent element, Broome asserts that Buchanan approved a $60,000.00 line item for the payment of "labor, overhead and contingency" in the Budget and blames any misuse of funds on a misunderstanding regarding that line item. (Exh. P-20, at 2; *see* Exh. D-12, at Broome-Panchos-0482). In fact, Broome adamantly maintained that he believed there was $60,000.00 built into the Budget and authorized by Buchanan as the construction company's profit to be used however the company so desired. (June 17, 2013 Tr. 39, 72–73; July 16, 2013 Tr. 143–44). Broome makes this argument despite the fact that the Budget does not identify profit as part of the line item. (Exh. D-12, at Broome-Panchos-0482).

Indeed, the very Budget that the Pancho's members drafted and that Broome asserts was approved by Buchanan shows that $360,000.00 was insufficient to complete the build-out. (*Id.*) According to the Budget, build-out would cost $373,163.27, which is $13,163.27 more than the amount financed through Westwood Square. (*Id.*) The Court's calculations show that the non-build-out expenses in the General Ledger total approximately $102,000, which is well above the amount Broome claims was basically a wild-card.[49] As the contractor, Broome knew or should

---

[49] The relevant charges were incurred from September 8, 2009 through part of December 4, 2009. (*See* Exh. P-16, at 1–6). These charges relate to the $360,000.00 loan in question. Buchanan did not specifically testify as to a total amount of charges the he believes were misused. (June 18, 2013 Tr. 153–55) But, Plaintiffs' counsel questioned Broome and Tolar about certain items in the Pancho's General Ledger that were questionable. Tolar, the former bookkeeper for Pancho's, reclassified the expenses into what he thought were the proper categories. (June 17, 2013

have known that the $60,000.00 was a buffer for contingencies relating to construction and that by immediately paying for expenses that were designated as part of the initial investment of the Pancho's members in the Budget, there would be insufficient funds to complete the build-out. The fact that payments were made to Pancho's members the day after the first distribution of loan proceeds was deposited into the Pancho's bank account and expenses related to the real estate company were later paid out of the loan proceeds tends to show that Broome never intended to use the loan proceeds solely for equipment or build-out purposes. The Court is satisfied that the evidence supports an inference that, at the time he made representations to the Plaintiffs regarding use of the loan funds, Broome did not intend to use the funds solely in accordance with the Budget he himself claims to have shown Buchanan before Buchanan agreed to make the loan. (June 17, 2013 Tr. 73). Thus, the third element of actual fraud has been met.

### e.  Plaintiffs justifiably relied on Broome's representations regarding the use of the loan proceeds.

Section 523(a)(2)(A) requires justifiable—not reasonable—reliance. *Field v. Mans*, 516 U.S. 59, 74–75 (1995). Determining whether reliance is justified is a subjective inquiry that depends on the particular plaintiff and circumstances. *E.H. Mitchell & Company v. Alonzo (In re Alonzo)*, No. 10-1044, 2011 WL 3586123, at *4 (Bankr. E.D. La. Aug. 12, 2011). But, "[t]he justifiable reliance standard imposes no duty to investigate unless the falsity of the representation is readily apparent or obvious or there are 'red flags' indicating such reliance is unwarranted." *Third Coast Bank v. Cohen (In re Cohen)*. No. 12-1004, 2013 WL 4079369, at *12 (Bankr. E.D. Tex. Aug. 13, 2013) (*citing Manheim Automotive Financial Services, Inc. v. Hurst (In re Hurst)*, 337 B.R. 125, 133–34 (Bankr N.D. Tex. 2005)). Moreover, "[a] person may be justified in relying on a representation of fact 'although he might have ascertained the falsity of the

---

Tr. 131–32). According to his testimony, items not designated as "leasehold" do not relate to build-out expenses. (*See Id.*).

representation had he made an investigation.'" *In re Futch*, No. 09-01841-NPO, 2011 WL 576071, at *20 (Bankr. S.D. Miss. Feb. 4, 2011) (citing *Field v. Mans*, 516 U.S. 59, 70 (1995) (quoting The Restatement (Second) of Torts, § 537 (1976))). "Stated another way, unless the falsity of a misrepresentation is obvious, or unless there are 'red flags' that serve as a warning that he is being deceived, a person's reliance is justifiable." *Id.* (citing *In re Mercer*, 246 F.3d 391, 418 (5th Cir. 2001)).

The evidence was sufficient to show that Westwood Square actually and justifiably relied on Broome's promise relating to the purpose of the loan and the use of the loan proceeds. The falsity of Broome's representations contained in the Budget regarding the use of funds was not obvious. And there was no evidence of any "red flag" that would have resulted in the imposition of a duty on Plaintiffs to conduct any investigation relating to the use of funds. Thus, the fourth element of actual fraud has been met.

### f.   Westwood Square suffered damages in the amount of $102,024.72

"It is not enough to show that false representations were made, the plaintiff must also show that her damage was flowed directly from the misrepresentations." *Kleppinger v. Rollins (In re Rollins)*, No. 06-1291, 2007 WL 2319778, at *9 (Bankr. E.D. La. Aug. 10, 2007) (citation omitted; discussing "but-for" causation). Buchanan relied on Broome's promise relating to the purpose of the loan and use of the loan proceeds. A portion of the proceeds were not used as required by the loan documents and it has not been repaid. Westwood Square has established that it was damaged. Thus, the fifth and final element of actual fraud has been met and the Court now turns to the amount of damages.

Buchanan argues that the entire $360,000 loan is not dischargeable, citing *Cohen v. Cruz*, 523 U.S. 213 (1998). (Dkt. No. 52, at 6; June 18, 2013 Tr. 173–74). In *Cohen*, the debtor was

charging rents above the levels authorized by a local rent control ordinance. *Cohen*, 523 U.S. at 215. The Hoboken Rent Control Administrator ordered the debtor to refund $31,382.50 to the affected tenants, but debtor failed to comply and subsequently filed for relief under Chapter 7 of the Bankruptcy Code. *Id.* The affected tenants filed an adversary proceeding against the debtor, arguing that the debt was obtained by actual fraud and was therefore not dischargeable under 11 U.S.C. § 523. *Id.* They also sought treble damages and attorney's fees and costs pursuant to New Jersey law. *Id.* The bankruptcy court found in the tenants' favor and awarded them treble damages totaling $94,147.50 as well as attorney's fees and costs, reasoning that § 523(a)(2)(A) encompasses all obligations flowing from the fraud, including punitive damages. *Id.* at 216. The debtor appealed, arguing that only the value of the fraudulently obtained funds was non-dischargeable. *Id.* at 222. The District Court and Third Circuit Court of Appeals both affirmed. *Id.* at 216. The Supreme Court also affirmed, holding that "§ 523(a)(2)(A) prevents the discharge of all liability arising from fraud, and that an award of treble damages therefore falls within the scope of the exception." *Id.* at 215.

The *Cohen* Court held that the scope of damages determined non-dischargeable under § 523(a)(2)(A) may extend beyond the value of the funds obtained by fraud to encompass "all liability arising from fraud." *Id.* But careful consideration of the underlying damages in *Cohen* illuminates an important distinction from this case. In *Cohen,* the initial amount the debtor was ordered to pay consisted only of the excess rents he charged his tenants. He was not ordered to reimburse the tenants for the entire amounts of rent they paid because the amounts constituting legitimate rent were properly paid and applied; only the excess amounts he charged resulted from his fraud. Similarly, in this case Broome properly applied most of the funds to the build-out of the restaurant; only the funds that were misapplied resulted from the fraud he committed.

The plain language of § 523(a)(2)(A) supports this reasoning. Section 523(a)(2)(A) excepts from discharge "any debt . . . *to the extent* obtained by" fraud. 11 U.S.C. § 523(a)(2)(A) (emphasis added). The use of the words "to the extent" in the statute necessarily implies a causal connection between the fraud and the debt. If the debt does not flow from the fraud, it cannot be excepted from discharge under § 523(a)(2)(A). Here, Buchanan seeks to except the entire loan from discharge, but the loan proceeds actually spent on the build-out were not obtained by Broome's fraudulent misrepresentation concerning the use of the loan proceeds.

Further, Buchanan did receive what he contracted for: the restaurant was built out. Regardless of whether the build-out constitutes an actual benefit in the form of added value, Buchanan did receive the benefit of his bargain. At least one bankruptcy court in the Fifth Circuit has taken the potential benefit received by the creditor into account in its damage calculation. *In re Blake*, 401 B.R. 839 (Bankr. S.D. Tex. 2009). In *Blake*, the debtor—a home builder and developer—received approximately $925,000.00 from the creditors, which was to be held as construction funds for the completion of their new home. *Id.* at 842. The home was never built and the creditors filed an adversary complaint against the debtor under § 523(a)(2)(A), contending that the debtor induced them to transfer the money by making false representations. *Id.* The creditors sought judgment for the amount they paid the debtor, attorney's fees and costs, and treble damages. *Id.* The debtor admitted to spending over $250,000.00 of the construction funds on personal expenses; $75,775.00 was transferred to the Home Owner's Association for improper tree removal; and $600,000.00 was transferred to the construction company the debtor hired to build the home. *Id.* at 845. Of the $600,000.00 transferred to the construction company, $260,000 was spent on construction costs that resulted in a foundation with significant defects. *Id.*

Because the creditors failed to allege that they did not receive any benefit from the funds expended on construction costs and failed to estimate the costs of repairing the improper tree removal and defective foundation, the court refused to find the entire $925,000.00 debt non-dischargeable. *Id.* Instead, the court "estimate[d] that the construction costs benefitted the [creditors] in the amount of $200,000.00," and deducted that amount from the money paid to the creditor to reach its actual damages calculation. *Id.* After analyzing Texas law regarding the award of attorney's fees and exemplary damages, the court concluded that creditors were not entitled to attorney's fees and costs, but were entitled to "exemplary damages in the amount of actual damages." *Id.* at 846.

In this case Buchanan received the benefit of his bargain. Indeed, unlike the creditors in *Blake*, whose house was never completed, Buchanan's property was converted into a usable restaurant space. And while there may be a dispute as to whether the conversion actually increased the space's value, Buchanan does not allege that he received absolutely no benefit from the construction. Further, unlike the *Blake* court, this Court need not estimate the value of the benefit conferred on Buchanan. The exhibits in evidence, along with the witness testimony at Trial, allowed the Court to calculate the funds improperly spent from the $360,000 loan.[50] While all liability arising from Broome's fraud is non-dischargeable, the loan proceeds he spent on the restaurant build-out do not arise from his fraud and Buchanan received the benefit of his bargain. Thus, only the funds that were improperly spent are non-dischargeable under § 523(a)(2)(A).

The Court finds that $102,024.72 of the $360,000.00 loan was improperly spent.[51] For the purposes of these calculations, the Court relied on the general ledger (Exh. P-16); trial testimony

---

[50] *See* Appendix A, attached.

[51] For a detailed analysis of the Court's calculations, *see* Appendix A, attached.

from Douglas Broome, Mathew Pellerin, Robert Buchanan, and Lindy Toler; and the "Conversion and Start-Up Budget." (Exh. D-1, at Broome-Panchos 315–17).

The Court notes that Broome makes much of the $60,000.00 line item for "Labor, Overhead, & Contingency" contained in the Conversion section. But as discussed above, the "Construction Sub-Total" in the Budget is $373,153.17. (Exh. D-1, at Broome-Panchos-316). Thus, Broome began the project short $13,153.17. Assuming that amount came out of the "Labor, Overhead, & Contingency line item," he was left with $46,846.83. Broome also testified that there was "a $70,000.00 cost overrun to the electrician and the HVAC people," (July 16, 2013 Tr. 45), and an unexpected $10,000.00 cost associated with the grease trap system, (*Id.* at 55), along with several other unplanned costs associated with the construction. Thus, it appears that the $60,000.00 line item was depleted by cost overruns and was unavailable to cover even the $52,137.00 in line items Broome himself classified as "overhead" expenses. (*See* July 16, 2013 Tr. 158).

## IV. CONCLUSION

For the reasons stated above, the Court finds that Broome's motion for partial judgment on the pleadings should be granted in part and denied in part as set forth herein. The obligation of Broome's guaranty of the $360,000.00 loan is non-dischargeable to the extent of the amount of funds improperly spent—$102,024.72 according to the Court's calculations—and reasonable attorney's fees.[52] Plaintiffs may submit an itemization of fees within twenty-one days of the date of this opinion for the Court's review and issuance of a final order.

## END OF OPINION ##

---

[52] "Although 'prevailing creditors still have no *statutory* right to attorney's fees' because § 523(d) only gives prevailing debtors a right to attorney's fees," creditors still have "the *contractual* right to attorney's fees . . . when that right arises from a contract between the creditor and the debtor . . . ." Matter of Luce, 960 F. 2d 1277, 1286 (5th Cir. 1992) (emphasis in original) (*quoting* Martin v. Bank of Germantown *(In re* Martin), 761 F. 2d 1163, 1168 (6th Cir. 1985)). The Promissory Note Broome signed contains an attorney's fees provision. (*See* Exh. P-2, at ¶6 (E)). Thus, Buchanan is contractually entitled to reasonable attorney's fees.

## APPENDIX A

**Line Items Not Listed as "Leasehold" Constituting Misappropriated Funds for Period from 9/8/09–12/4/09[53]**

Salaries………………………………………………………………………$50,991.58

Rent (Ultimate Party/ Westwood Deposit)…………………………………......$11,850.00

Cell Phone Bills…………………………………………………………....$2,995.55

Equipment……………………………………………………………$3,943.77

Travel Expenses……………………………………………………………$11,101.18

Meals/Miscellaneous Expenses……………………………………………......$7,997.16

Expenses Marked as Cornerstone…………………………………………..$9,144.86

Other………………………………………………………………....$4,000.62


Total…………………………………………………………………..……$102,024.72

---

[53] The Court only references items from this time span because items beyond December 4, 2009, were not spent from the initial $360,000.00 loan.

**Salaries Total**: **$50,991.58**

- **Pellerin, Broome, Tolar: $36,023.90**[54]
  - **Pellerin Total: $14,773.90**
    - 9/10 ($5,000.00)
    - 10/2 ($5,000.00)
    - 11/2 ($1,023.90)
    - 11/13 ($2,500.00)
    - 12/1 ($1,250.00)
  - **Broome Total: $11,250.00**
    - 9/10 ($5,000.00)
    - 10/2 ($5,000.00), replaced 10/2
    - 11/2 ($2,500.00)
    - 11/13 ($2,500.00)
    - 12/1 ($1,250.00)
  - **Tolar Total: $10,000.00**
    - 9/10 ($2,500.00)
    - 9/17 ($1,250.00)
    - 10/2 ($1,250.00)
    - 10/15 ($1,250.00)
    - 10/30 ($1,250.00)
    - 11/13 ($1,250.00)
    - 12/1 ($1,250.00)

- **Cindi Coyle Total: $5,452.25**[55]
  - 9/10 ($994.05)
  - 9/17 ($530.72)
  - 10/2 ($764.30)
  - 10/15 ($873.02)
  - 10/15 ($138.92)
  - 10/30 ($749.71)
  - 11/13 ($740.70)
  - 12/1 ($660.83)

- **Wanda Henderson: $803.53**
  - 11/13 ($192.63)
  - 12/1 ($610.90)

- **Stubblefield Total: $8,711.90**[56]
  - 9/10 ($2,350.00)
  - 9/17 ($1,022.38)
  - 10/2 ($1,022.38)
  - 10/5 ($1,022.38)
  - 10/30 ($1,022.38)
  - 11/13 ($1,022.38)
  - 12/1 ($1,250.00)

---

[54] At trial, the parties disagreed as to whether Buchanan approved of Broome, Pellerin, and Tolar paying themselves, Wanda Henderson, and Cindi Coyle a salary from the loan proceeds. (*Compare* June 17, 2013 Tr. 71 *with* June 18, 2013 Tr. 135). Broome included these salaries in his calculation of "overhead expenses." (July 16, 2013 Tr. 156–57). But the Budget contains a $12,000.00 line item for "Management Pre-start Salary," in section one, labeled "Franchise & Pre-Opening Budget." (Exh. D-1, at Broome-Panchos 315). None of the line-items in this category are marked "funded through lessor's loan," which would indicate that payment should have come from the $360,000.00 loan Broome received from Buchanan. (*Id.*). And in fact Broome initially testified that the draws for him and Pellerin fell into this category. (July 16, 2013 Tr. 87). But he quickly changed his position to assert that the salaries fell under the "overhead and contingencies" category. (*Id.*). Finally, Buchanan testified that he "told these guys that they should take their money from their own business." (June 18, 2013 Tr. 135). Thus, the court finds these salary payments constitute an inappropriate use of the loan proceeds.

[55] Broome testified that Cindi Coyle was his assistant at Cornerstone Realty (June 17, 2013 Tr at 33–34).

[56] Steven Stubblefield was hired to manage Pancho's. (June 17, 2013 Tr. 31). Broome testified that he was working at Pancho's prior to opening and was involved with setting up equipment and drawing up plans for the restaurant. (*Id.* at 31–32). But regardless of the depth of his involvement in the restaurant prior to the grand opening, the Court notes that the Budget contains a $12,000.00 line-item for "Management." (Exh. D-1, at Broome-Panchos 315).Thus, the Court finds these payments constitute an inappropriate use of the loan proceeds.

**Rent Total: $11,850.00**
- 9/14- Ultimate Party ($3,850.00)[57]

- 10/12- Ultimate Party ($3,850.00)

- 9/18- Westwood Deposit ($4,150.00)[58]


**Cell Phone Total: $2,995.55**[59]
- 9/23- ATT ($423.68)
- 10/2- Cellular South ($239.73)
- 10/9- Cellular South ($243.57)
- 10/9- ATT ($478.61)
- 10/13- Cellular South (marked as Cornerstone) ($374.97)
- 10/23- Cellular South (marked as Cornerstone) ($131.59)
- 11/5- Cellular South (marked as Cornerstone) ($241.37)
- 11/5- Cellular South (marked as Cornerstone) ($246.48)
- 11/9- ATT ($433.46)
- 12/4- Cellular South ($182.09)

---

[57] The Court notes that the Budget contains a $12,796.00 line item for "Pre-Opening Occupancy Expenses," in section one. (Exh. D-1, at Broome-Panchos-315). Section one does not contain any line items marked as "funded through lessor's loan."

[58] Broome testified that "Mr. Buchanan suggested" that the rental payments for the Westwood Square Shopping Center would be paid from the loan proceeds. (June 17, 2013 Tr. 37). The Court does not find this testimony credible. First, there is a line item for $4,100.00 specifically allocated to "Rental Deposit" under section one of the Budget, labeled "Franchise & Pre-Opening Budget." (Exh. D-1, at Broome-Panchos-315). This section of the budget does not contain any line items designated as "funded through lessor's loan." Further, Buchanan testified several times that the money from the initial $360,000.00 loan was to be spent solely on the construction and build-out of the restaurant. (June 18, 2013 Tr. 75–76, 82, 97, 132). In fact, when asked about the $60,000.00 labor and contingency line item, Buchanan specifically testified that "[f]rom the very beginning, I said, don't want you guys taking money out of this thing, because it's going to be hard enough to borrow it for the build out." (*Id.* at 131–32). And, when asked if he knew Broome, Pellerin, and Tolar had been paid salaries out of the $360,000.00 loan, Buchanan testified that "[f]rom the very beginning, I told these guys that they should take their money from their own business. That I was loaning them money to build out the restaurant." (*Id.* at 135). Therefore, the Court does not find Broome's testimony that it was Buchanan's idea to pay the rental deposit on the Westwood Square property out of the loan proceeds credible.

[59] Lindy Tolar testified that the bills from Cellular South were attributed to Pellerin and Broome's cell phones, which they used to "sell real estate." (June 17, 2013 Tr. 142). Additionally, Broome also testified that the phone bills were attributable to his and Pellerin's cell phones. (*Id.* at 54). Further, Broome could not explain why there were two separate payments to Cellular South on November 5, 2009. (*Id.* at 61). Finally, Broome explained that the AT&T payments were for the landlines at the Century 21 Office, (*Id.* at 44), and he included them in his own calculation of what he deemed "overhead" expenses not specifically associated with the build-out. (July 16, 2013 Tr. 156).

**Equipment Total: $3,943.77**[60]

- 9/10- Office Depot ($1,100.00)[61]
- 10/19- Owens Business ($1,068.93)[62]
- 10/19- Office Depot ($555.06)[63]
- 10/19- Office Depot ($1,219.78)

---

[60] The Court notes that the " Use of Funds" paragraph in the "Agreement for Commercial lease and for Financing of Build-Out," specifies that $105,000.00 of the $360,000.00 loan was to be used for the purchase of equipment. (Exh. P-1, at 3 ¶7(A)). Thus, the $105,000.00 is not included in the Court's damages calculation. Additionally, Broome testified specifically that the $775.00 charge for D&E Trucking and the $542.50 charge for Labor Finders were related to the transport of Pancho's equipment from Arizona to Hattiesburg. (July 16 Tr. 102–03). And expenses for U-Haul rental ($34.00 on September 11 and $149.23 on October 1) along with expenses for D&E Trucking ($4,500.00 on September 17 and $775.00 on October 9) were labeled "equipment," leading the Court to believe these charges were also associated with the equipment move. (*See* Exh. P-16). The Court also notes that in the Budget there is a $10,000.00 line item allocated as "Equipment Move/ Install" listed under section two, which is marked as "funded through lessor's loan." (Exh. D-1, at Broome-Panchos 316, 317). Thus, the Court did not include these expenses in its calculation.

[61] Broome testified that this check was for a laptop, purchased at Office Depot, for Steven Stubblefield to use. (June 17, 2013 Tr. 35).

[62] Broome testified that this expenditure was for a copier machine, kept at the Cornerstone Century 21 Building, which was used for "publicity" for Pancho's. (June 17, 2013 Tr. 48). The Court notes that the Budget reflects $2,700.00 for "Office Materials/Supplies" in section one and $7,500.00 for "Advertising & Media" in section three. Neither section contains any line items labeled "funded through lessor's plan." (Exh. D-1, at 315, 317).

[63] Broome testified that he did not know what either this payment or the one below it ($1,219.78) were for. In any event, the Budget allows $2,700.00 for "Office Materials/Supplies," listed under section one, labeled "Franchise & Pre-Opening Budget." None of the line items in section one are labeled as "funded through lessor's loan." (*Id.* at Broome-Panchos 315, 317).

- **Travel Total: $11,101.18**[64]

- **Pellerin/Broome: $6,320.00**
  - 9/23- Pellerin ($1,320.00)
  - 10/2- Broome ($5,000.00)

- **Broome/Pellerin Training: $1005.12**[65]
  - 9/28- Valero ($40.02)
  - 9/29- Shell ($40.00)
  - 9/29- Super 8 ($796.08)
  - 9/29- Panchos ($34.02)
  - 10/1- Shell ($40.00)
  - 10/1- Mobility Med.($55.00)

- **Cindi Coyle Total: $640.85**[66]
  - 9/17 ($95.15)
  - 10/2 ($139.69)
  - 11/13- Gas ($271.87)
  - 12/1- SPLIT ($134.14)

- **Gas Total: $218.44**
  - 10/2- Exxon ($30.00)
  - 10/21- Exxon ($60.00)
  - 10/16- PURE ($64.00)
  - 10/26- Stuckey's ($64.44)

- **Tuesta/ Means: $1,313.00**[67]
  - 11/30- Tuesta ($175.00)
  - 11/30- Tuesta ($563.00)
  - 12/3- Tuesta ($200.00)
  - 11/30- Means ($175.00)
  - 12/3- Means ($200.00)

- **Accommodations Total: $1,347.50**
  - 9/24- Hotels.com ($558.63)
  - 10/7- Hotels.com ($62.43)
  - 11/23- Orbitz ($335.28)[68]
  - 12/3- Orbitz ($391.16)

- **Miscellaneous Total: $256.27**
  - 9/18- Houston ($148.10)
  - 10/2- Spec. Med. ($20.00)
  - 10/2- Macaroni Grill ($56.11)
  - 10/2- UPS Store ($32.06)

---

[64] Broome testified that $3,300.00 was given in cash to Steven Stubblefield for his travel to get the Pancho's equipment. (June 17, 2013 Tr. 30). Additionally, Broome stated that John Stubblefield was reimbursed $743.80 for paying Steven Stubblefield's air fare for the equipment pick up and Steven Stubblefield was reimbursed $391.16 for hotel expenses associated with the trip. (*Id.* at 34). The Court excluded these amounts from its calculation.

[65] Broome identified these specific items as travel expenses associated with Pancho's training he and Pellerin received in Houston. (July 16, 2013 Tr. 153). There is no line item for training in the Conversion budget (Exh. D-1, at Broome-Panchos-315–16).

[66] Broome testified that Cornerstone reimbursed Coyle for travel from her home. (*Id.* at 33, 67).

[67] Broome testified that Ricky Means and Hector Tuesto—hired as cooks—were each reimbursed for their travel to receive training in Houston. (*Id.* at 116).

[68] Broome testified this charge was to send cooks to Houston for training. (July 16, 2013 Tr. 114).

**Miscellaneous Expenses Total: $7,997.16**[69]

- **Meals Total: $312.62**
  - 9/23- Olive Garden ($64.03)
  - 10/13- Newks ($17.87)
  - 10/15- Arby's ($15.67)
  - 10/20- Byd. Burgers ($12.93)
  - 10/26- Papa John's ($22.04)
  - 10/26- Purple Parrot ($49.55)
  - 12/1- Chilis ($130.53)

- **Domain Registration: $177.05**
  - 9/10- Domain regist. ($39.80)
  - 11/3- Domain regist. ($107.40)
  - 11/5- Domain regist. ($29.85)

- **Wal Mart: $65.68**
  - 10/7- Wal Mart ($10.00)
  - 10/22- Wal Mart ($12.47)
  - 10/26- Wal Mart ($38.74)
  - 11/2- Wal Mart ($4.47)

- **New York Life: $324.50**[70]
  - 9/23 ($78.00)
  - 10/7 ($39.00)
  - 11/9 ($39.00)
  - 12/3 ($168.50)

- **Banks/ Fin. Institutions: $1,737.31**
  - 9/10- Citizens ($15.00)
  - 9/10- Citizens ($15.00)
  - 11/3- Citizens ($15.00)
  - 9/14- Community loan. ($656.00)
  - 9/14- Interest Loan fee ($100.00)[71]
  - 11/2- Community loan ($656.00)
  - 11/20- Newpoint Fin. ($122.36)[72]
  - 12/3- Newpoint Fin. ($6.00)
  - 12/3- Merchant bank ($151.95)

- **Advertising: $5,380.00**[73]
  - 10/21- Oak Grove Drama ($200.00)
  - 12/4- H'burg Publ. ($180.00)
  - 11/6- Comcast ($5,000.00)

---

[69] Broome testified that House and Lowery were site supervisors and were reimbursed for building materials. (June 17, 2013 Tr. 49; July 16, 2013 Tr. 110). These checks ($479.41 to House on October 15, $822.11 to House on October 19, and $700.95 to Lowery on December 4) are not included in the Court's calculations, though Broome included payments to House in his own overhead calculation. (July 16, 2013 Tr. 157).

[70] Broome testified that Buchanan conditioned the loan on both he and Pellerin obtaining life insurance policies from Buchanan's son. (July 16, 2013 Tr. 154). In any event, the policies are not related to the build-out.

[71] Broome testified that this charge was related to interest on a loan for membership to the Area Development Partnership (ADP), not related to construction. (July 16, 2013 Tr. 152)

[72] Broome testified that he does not know what either Newpoint financial charge relates to. (July 16, 2013 Tr. 113).

[73] Broome testified that the advertising costs for Pancho's were not related to the build-out. (*Id.* at 119). The Court further notes that in the Budget, there is a $7,500.00 line item listed as "Advertising & Media" under section three, labeled "Training & Grand Opening Budget." (Exh. D-1, at Broome-Panchos-317). Section three does not contain any line items marked as "funded through lessor's loan." (*Id.*).

**Cornerstone Expenses Total: $9,144.86**[74]

- **Rent Total: $4,040.00**
  - 9/10 ($2,000.00)
  - 10/2 ($1,040.00)
  - 10/30 ($1,000.00)

- **Property Taxes: (9/10): $628.17**

- **Loans Total: $1,188.25**
  - 9/22 ($625.00)
  - 10/16 ($540.00)
  - 10/16 ($23.25)

- **Dues Total: $1,043.00**[75]
  - 9/14- Chamber ($733.00)
  - 9/14- Century 21 ($310.00)

- **Misc. Total: $1,870.44**
  - 9/22- Invoice ($75.00)
  - 110/9- Hburg Am. ($846.29)
  - 10/9- Power bill ($316.38)
  - 10/30- Tolar reim. ($141.02)
  - 11/3- Coke mach. ($95.82)
  - 11/13- Am. Empl. ($312.50)
  - 11/20- HAAR ($54.00)
  - 11/20- Water bill ($29.43)

- **Storage (Outback) Total: $375.00**
  - 9/11 ($138.00)
  - 9/22 ($30.00)
  - 10/2 ($69.00)
  - 10/30 ($69.00)
  - 11/20 ($69.00)

---

[74] Tolar testified that any expenses marked as "Due to/from Cornerstone" were those paid on behalf of Cornerstone out of the funds from the Buchanan loan. (June 17, 2013 Tr. 132).

[75] Broome testified that these expenses were related to ADP membership, which was required to submit a loan application to the ADP for the rest of the money they needed. (July 16, 2013 Tr. 151). He further explained that the second charge ($310.00) was to bring Cornerstone current and that ADP would not approve Pancho's membership until Cornerstone's dues were paid. (*Id.* at 152).

**Other Total: $4,000.62**[76]

- **Utilities: $577.22**
  - 9/23- H'burg water ($13.43)
  - 10/22- Power ($340.38)
  - 11/20- Power ($223.41)

- **Other Expenses: $3,423.40**
  - 9/8- Legal Fees ($1,500.00)[77]
  - 9/23- ServSafe trng ($130.00)
  - 10/7- FedEx ($10.48)
  - 10/13- UPS Store ($48.75)
  - 10/13- B/Bry Ins ($496.25)[78]
  - 10/15- Ferrell St ($62.78)
  - 10/30- LLC Form. ($50.00)
  - 11/2- Pet Smart ($13.14)
  - 11/3- Winn Dixie ($50.00)[79]
  - 11/6- Impact ($182.00)
  - 11/23- Payroll ($500.00)[80]
  - 11/24- Tax ($342.50 +$15.00)[81]
  - 11/25- Beer License ($22.50)

---

[76] The Court did not include any of the items, totaling $47,518.97 that could be characterized as fixtures, including: $4,280.00 for front doors on September 17; $1,346.00 for fireplaces on October 23; $2,466.35 for fireplaces and stone on December 4; payments to classic concepts ($2,808.75 on October 30, $2,808.00 on November 13, and $1,626.40 on November 20); $836.58 to Sam's Club on November 30 for the phone system, (*see* July 16, 2013 Tr. 117); $205.44 to Signs 1st on October 30; payments to Fred Windham for signs ($1,500.00 on November 6, $1,500.00 on November 13, $202.43 on November 20, and $800.00 on November 24); payments for plumbing ($351.10 and $300.10 to Noland on November 23, $209.53 to So. Pipe on November 23, $225.07 to Christopher on November 27, and $1,940.22 to Christopher on December 4); payments for the dumpster ($450.00 on November 6, $310.00 on November 11, $310.00 on December 3); and payments to Grover Brothers ($2,000.00 on October 23, and $21,043.00 on November 9).

[77] Broome testified that the legal services were provided in association with setting up Panchos. (June 17, 2013 Tr. 30). But the Budget allocates $3,000.00 for legal fees in section one. (Exh. D-1, at Broome-Panchos-315, 317). And Broome initially mentioned section one when asked about the legal fees, but changed his position and called them "overhead" expenses (July 16, 2013 Tr. 86–89).

[78] Broome testified that he obtained insurance for the Pancho's location. (July 16, 2013 Tr. 153–54).

[79] Broome testified that this expenditure was for groceries to make chili for the workers. (July 16, 2013 Tr. 154).

[80] Broome testified this expense was for the payroll deposit. (July 16, 2013 Tr. 113–14).

[81] Broome testified these expenses ($342.50, $15.00, and $22.50) were for sales taxes and the beer license.